## MELVIN RAINWATER V. THE STATE.

No. 20908. Delivered May 8, 1940.
Rehearing Denied June 26, 1940.
Application to File Second Motion for Rehearing Denied
October 16, 1940.

The opinion states the case.

*James E. Faulkner,* of Henderson, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is neglecting and refusing to provide for the support and maintenance of minor children under 16 years of age; the punishment, confinement in the penitentiary for two years.

The indictment, charged in substance that on or about the first day of February, 1939, appellant was the father of Noble Rainwater, Lloyd Rainwater, Billie Rainwater, Jack Rainwater, Ray Rainwater and Ester Lena Rainwater, and that appellant unlawfully and wilfully deserted, neglected, and refused to provide for the support and maintenance of said Noble Rainwater, Lloyd Rainwater, Billie Rainwater, Jack Rainwater, Ray Rainwater, and Ester Lena Rainwater, said Noble Rainwater, Lloyd Rainwater, Billie Rainwater, Jack Rainwater, Ray Rainwater and Ester Lena Rainwater, and each of them, being under the age of sixteen years.

It is appellant's contention that the testimony fails to show that the minors named in the indictment were under sixteen years of age.

We are unable to agree with this contention. Mrs. Lela Rainwater, the mother of the children, testified that Ester Lena Rainwater was six years of age. Noble Rainwater testified that he was 15 years old. Further, he said: "I am one of the minors named in the indictment." Referring to the children of appellant, a witness for the State testified: "The children weren't grown, they ranged from 5 or 6 on up, about like stairsteps." A deputy sheriff testified that he went to the home of Mrs. Lela Rainwater during the last of May, 1939, and observed the children who were there at the time. He said: "There were five children there at that time, little fellows, one was 14 and from that on smaller." Mrs. Lela Rainwater testified that Lloyd Rainwater was 11 years old. Appellant introduced in evidence paragraphs 1 and 2 of a divorce petition filed by Mrs. Lela Rainwater against the appellant. We quote paragraph 2 as follows: "Plaintiff represents to the Court that there was born to this marriage several children, the following of whom are under the age of 16 years, to-wit: Noble Rainwater, a boy of 14 years of age, Lloyd Rainwater, a boy 12 years of age, Billie Rainwater, a girl 10 years of age, Jack Rainwater, a boy 8 years of age, Ray Rainwater, a boy 7 years of age and Ester Lena Rainwater, a girl 6 years of age." In the petition for divorce Mrs. Rainwater prayed that she be given the permanent care and custody of the minor children named in the petition, and that the appellant be required to pay not less than twenty-five dollars a month for the support and maintenance of said children. After appellant introduced the mentioned excerpts from the divorce petition the State introduced a part of the decree of divorce, which reads as follows: "It is further ordered that the plaintiff be awarded custody of the minor children and defendant ordered to pay twenty-five dollars per month to the minor children under sixteen years of age." We think the record, in its entirety, sufficiently shows that the children whose names were set forth in the indictment were under 16 years of age.

Appellant contends that the evidence is insufficient to support the judgment of conviction, it being his position that the proof on the part of the State fails to show that he was able to contribute any more to the support of his minor children than they received at his hands. Before adverting to the testimony adduced by the State, it is observed that the indictment

charged that appellant wilfully deserted, neglected and refused to provide for the support and maintenance of his minor children on or about the first day of February, 1939. The indictment was returned on the 11th day of July, 1939. Hence it is seen that under the indictment appellant could be held for his failure to support his children during 1936, 1937, and until February 1, 1939. Mrs. Lela Rainwater testified that from July 12, 1936, to July 11, 1939, her children had been in need of clothes and food. She said: "My boy was working on the WPA getting twenty-six dollars a month. They were in need of food, clothing and medicine from time to time. They couldn't go to school. I have put my little children to bed lots of times crying for something to eat, and they would get up in the morning hungry, crying for food. My husband married again two weeks after he got the divorce. From July 12, 1936, until July 11, 1939, Mr. Rainwater (appellant) did not give me any money."

The witness testified further that the youngest child was six years old and was afflicted. It was her further version that she (the witness) was unable to work. Again, she testified that occasionally appellant would bring some groceries to the house, but they were brought at wide intervals and were not sufficient to give the children enough to eat. She testified that after appellant left her he sold what cattle he had and used the money. Shortly after making the sale of the stock he bought an automobile.

Again, we quote from the testimony of the witness, as follows: "The children named in the indictment have lived with me all the time from July 12, 1936 until the first of January 1937, and they are still living with me. Melvin Rainwater, the defendant, hasn't supported the children very much from the 12th of July, 1936 until the 1st of January, 1937; he has helped some but it was so little we couldn't live on it. He did not furnish any money. He furnished a few groceries this Spring a year ago, but mighty little. From July 12, 1936 until January 1, 1937, he did not give me any money at all and what groceries he would bring in would not do a week. What he did bring was just a little paper sack, a little sack of flour, sometimes 4 pounds of lard and sometimes 1 pound of lard, and a little meal, and 10c worth of baking powder, and a small amount of beans, like he was buying for a small family. I had 9 children to feed. When he would bring these groceries it was mighty far apart, sometimes a month and sometimes two months and sometimes three months before I would see him."

The witness testified further that during the first half of the year 1937 appellant was living "at Eloise Norvell's," where he

and Miss Norvell made a crop. The witness said: "In 1937 he was working for them, staying at Mr. Norvell's and helping. He owned an automobile at that time, he was driving it and she was with him." The witness testified further: "During the year 1938, part of 1938 I was living on the Kangerga place. Melvin Rainwater was living on Mr. Norvell's place. He and Eloise Norvell were farming on the place at Tatum during that year. During 1938 my husband did not buy any clothing for the children and did not give me any money with which to buy the children food and clothing. He did not contribute any to the family, through me or through any of the children there at home. During the year 1938 he brought us out some groceries from Tatum, just a little, not very much, it was so far apart we couldn't live on it and we were on relief, what the boy was making and relief we tried to get by, that was in the Spring of 1938, he didn't bring in very much, like I told you just like for a small family, and that fall he hasn't brought us a bunch of groceries, in March he brought us a bill of groceries, along the middle of March in 1939. He brought those himself, a negro was driving the car, he was in a car with a negro, that is when he came and wanted me to give him the divorce is when he brought the groceries.

"In March was the biggest bill of groceries, it lasted a week that time, he brought a sack of flour, sack of meal, 4 pounds of lard, a quarters worth of beans, and 10 pounds of potatoes, 10 pounds of baking powder, nickle box of salt, a nickle box of soda. That is the first time he brought that much."

Mrs. Rainwater was awarded a divorce during the spring of 1939. According to her testimony, appellant married Eloise Norvell two weeks after the divorce had been granted. It appears that at the time appellant left his wife and children—in March, 1935,—that he had work which paid him from twenty to forty dollars a week. Mrs. Rainwater testified that appellant stated to her that he made from twenty to forty dollars a week. Further, she testified: "Mr. Rainwater could have gotten a job, he had a job when he went to Eloise's, he lost it on account of it. He could have bought more groceries than he sent to us." We quote from the cross-examination of the witness as follows: "In 1937 he was still staying at Mr. Norvell's and they were working together, claimed they had oil wells, going to have, he told me that and talked like he would get rich. As to whether or not I knew he had money to buy supplies for the children, I will state he was working for them, he was taking care of Eloise, I don't know how

much cotton they sold and they had pea checks. The pea check came in his name last year, I was at the court house. In 1937 I know they farmed, I didn't go down there, I don't know how many bales I didn't go and ask, I gave this man plenty of chances to do something, I gave him more chances than he would give me."

Mrs. C. E. Brasick, a witness for the State, testified that she went to the home of Mrs. Lela Rainwater during the month of April, 1939, and found that her children were sick with the measles. She testified that the children were in need of food and clothes; that she (the witness) fixed a gallon of soup and bought a three-pound box of crackers and a gallon of buttermilk for them. She said: "I found that the children needed clothes. Their clothing was ragged and the baby was without any underwear on. Just a dress. Some of the boys were ragged and dirty."

Robert Rainwater, a son of the appellant, testified that when appellant left home he sold almost all of the stock he had and bought an automobile. Again, he testified that appellant bought another automobile in 1937. At this juncture we quote from the testimony of the witness: "He (appellant) sold the only milk cow we had. I have talked with my father myself during that three year period of time and urged and requested him to do something for the children, but it didn't do any good. I told him the circumstances, that they were in need * * * Every time I would hit him up he would always tell me he was going to do something the next week, had a check coming in, had a lease at Talco, and would do it next week. * * * He goes dressed most of the time in good clothes, a whole lot better than my mother and the children. There have been times when they look scary. I have gone down there to see them and turned around and come to town and got groceries to do them a night or two, do as much as I could, and I wasn't able to do that." We quote further from the testimony of the witness as follows: "My father was living here in town during that period of time, he was living at Mr. Norvell's. He never did tell me he did not do these things for his family because he wasn't able, he would tell me he would have it coming, that he would have plenty of money and he was going to do this as soon as the check came in, he was buying things one time I carried some stuff down there and the next time he went down he bought some new tires and fixed up his old car and everything, had a new motor put in it where he could get around and about."

Sam Howard, a witness for the State, testified that he had been in the home of Mrs. Rainwater during the time in question and had found that they had practically no food in the house, that on one occasion the children had nothing to eat but a little corn bread. He testified that he bought them some groceries.

Reverend G. T. Reeves, pastor of the Christian Church in Henderson, testified that he visited in the home of Mrs. Lela Rainwater on several occasions; that about ten months before the trial he went there for the purpose of investigating the condition of the children; that they were very much in need; that on several occasions he took them provisions; that his church people visited them. He testified: "I ascertained the children were in needy circumstances. I didn't see their wardrobe but from all indications they needed clothes. They were not so well clothed and looked like they were in need."

Luke Howeth testified that during the period of time in question he had been in the home of Mrs. Rainwater when the children had nothing to eat. He said his wife had at times provided them with milk and other food. Again, he testified that during the month of February, 1938, he frequently gave Mrs. Rainwater's children the lunch he had carried to his work on the highway.

George Rainwater, a son of the appellant, testified that appellant had not contributed ten dollars toward the support of the children under 16 years of age in three or four years; that on several occasions the children were in dire need of food and were hungry. He said: "There have been times we didn't have one bite in the house. A couple or three days and we would borrow from somebody. We would go that long without milk for the youngest to drink, daddy sold the cow. We didn't have clothing or bed clothes, you might say, until people brought some out there. We didn't have sufficient cover to keep warm at night, it has been that way a long time, most of the winter, lots of times we would keep a fire in the heater all night long. My father was acquainted with conditions out there, he knew we were in need of food and clothing and bed covers, I told him. I would go out to the farm close to Tatum with my father. One time he wanted me to help him do something and said he would give us some groceries if I helped him so I helped him and he didn't give us any groceries. * * * I have seen my father with money during the last three years. I have asked him for money to carry to my little brothers and sisters, he said he didn't have it to spare." The witness testified that during the years

1937 and 1938 while appellant was working on Mr. Norvell's farm he had seen appellant with money on several occasions.

Noble Rainwater, fifteen year old son of the appellant, testified, in part, as follows: "I recall when I ceased to live with my father four years ago. My father quit living with me. He started going with other women, I know he did, I saw the one he was going with, running around with. I saw that up there by the old jail when he worked up there at the old jail poisoning rats. I seen him and this woman he is living with out lots of times together." The witness testified that he had seen his father working on the Norvell farm since 1936. We quote further from the testimony of the witness: "During the last three years we have been very much in need of something to eat out there, we didn't have anything to eat at all. Some berries is all, we picked the berries and ate them every meal, that was all we had. * * * My father never sent any food down there that I know of by anybody, cab drivers or negroes."

Testifying in his own behalf, appellant denied that he had wifully neglected and refused to support his minor children. He said that he left his family in 1935 because his wife's family constantly carried grocerise and supplies away from his home. He testified that after the separation he carried groceries to his home and found that two or three families were living there. In 1937 he worked in the oil field, during which time he furnished his family groceries. At this juncture we quote from appellant's testimony as follows: "Lots of times I carried groceries down there, several times. The first part of 1937 I worked some in the oil field, that was not regular work. My average pay roll for the month would depend on how much I could make, I was leasing and subleasing, some months it wasn't anything, some months I would make a little money, I would come in and go down and see my boy at the Safeway, I always used him to buy the groceries, I knew if that was put in other hands they would not get them, I had the understanding when I came through to get the groceries or leave money, or leave a check, they would be delivered, most of the time I delivered them myself but I bought them from him at the Safeway."

Appellant produced several checks which had been executed by Eloise Norvell. It was his version that she had delivered these checks to him for the purpose of buying supplies for Lela Rainwater and her minor children, and that they were used for such purpose. Further, appellant testified that during the year 1936 he worked in the oil field most of the time, coming to town about once a month. As to his income during that time, appel-

lant testified: "As to what my income was during that time I will state I don't know, sometimes I would make a little money and sometimes I would not, of course I still have a little property up there but it is in a law suit and I haven't realized anything much out of it. Sometimes I would make a trade and make $50 or $75 and go along and not make anything. Whether I made a pay day or not I would send money in because I could get the money from Eloise and I did it too, those checks I gave on her I borrowed from her. I sent them supplies or groceries when I was able to do so, I borrowed money to get groceries for them."

During the year 1937, according to his version, appellant worked for his room and board. During 1938 he made a crop on the place belonging to Eloise Norvell. He said he planted twelve acres of cotton and raised one bale, for which he received about eight or nine cents a pound. He planted some corn but did not raise any. He said: "I didn't pay any rent out of it. I was trading with Porter-Pitman. I signed up with them and got groceries, they had a mortgage. I signed up the Government Conservation Program and got a check for $80 or $90 this year, I signed up in 1938. That payment was divided between the landlord and myself. That was the year I made the one bale of cotton. I did not have any other income that year. Year before last when I was overseeing Miss Norvell's place I received a check for $13 and something. I was just managing that crop, that was Miss Norvell's place at Tatum, I wasn't farming, I was overseeing. * * * I gave the $13 check to Miss Norvell for my room and board."

Appellant testified that he married Miss Norvell April 30, 1939. He said: "I considered myself able to support my present wife and the children also, if you will permit me to tell you what I offered them, I certainly do. The place I offered them is not in my back door, it is a mile from where we were staying, we were willing to give her a deed to 20 acres of land on the place and I would see that the children got to go to school at Oakhill or Tatum. I didn't have any land to deed her but I had made arrangements with Miss Eloise Norvell for 20 acres of land, she had some land. I tell this jury that I certainly did tell Mrs. Lela Rainwater that she would be given a deed to 20 acres of land outright, I told you that, deed it to her in fee simple as long as she lived there she could have the place, not to trade or sell but as long as she lived there or the children. It was an out right deed as long as she made her home there. I made them that offer before I married and after I married too, I made it to them several times this year. It is about a mile and not in sight

of the house occupied by Eloise Norvell and myself. I told my wife if she would go down there we would rent the other part of the farm to somebody else that we didn't have to live there, and we would furnish her a team and tools and rent the remainder out to somebody else." Appellant testified that at the time Miss Norvell authorized him to offer his first wife a farm he had no income.

It was appellant's version that he had high blood pressure and was unable to do heavy work. He said that he had sought work on many occasions, without success. Mrs. Eloise Rainwater, formerly Miss Eloise Norvell, testified for appellant. It was her version that during the year 1938 she and appellant frequently gave groceries to appellant's first wife. In short, her testimony corroborated that of appellant. She testified, further, that in 1938 and again in 1939 she authorized appellant to offer Mrs. Lela Rainwater a 20-acre farm to be used by her during her life and the time she lived on it. She said: "It was my land—our's now." Further, she testified that the offer was made prior to the witness' marriage to appellant, and several times thereafter. At this juncture we quote from her testimony as follows: "As to whether or not if my position and that of Lela Rainwater were just the reverse, were she the present wife of Melvin Rainwater and me the mother of those children and he the father, would I accept such an offer coming from her, I will state that I believe I would, considering how far apart it would be, there is no difference she came to see Robert, I can't see a bit of difference, I would not molest the woman, she would not have to lay eyes on me. I believe I would accept it if I had those children and the father thought as much of them as he does, let him tell you. If I was as hungry as the boys said I would get a job, I can always get a job. As to whether or not I have been able to find him a job, I will state he has been sick, he had a fibroid tumor cut off the base of his brain, if you had that you would feel it too, he has been sick since 1937."

In rebuttal, the State proved that the offer mentioned in the testimony of appellant and his second wife had not been made. Further, the State introduced witnesses who rebutted the testimony of appellant and his witnesses to the effect that appellant many times furnished ample supplies of groceries for the support and maintenance of his minor children.

We deem the evidence sufficient to support the conclusion of the jury that appellant, "with evil intent and malice and set purpose and design" neglected and refused to support his minor children.

Appellant testified, in effect, that he contributed to the support and maintenance of his children to the best of his ability and in proportion to his earning capacity, when he was earning money or had funds. Appellant requested an instruction submitting this affirmative defense to the jury. The court embraced in his main charge the following instruction, which was written in substantially the language as the requested instruction presented by appellant: "You are further instructed that if you find from the evidence in this case the defendant, Melvin Rainwater, contributed to the support and maintenance of his said children to the best of his ability and in proportion to his earning capacity when he was earning or had funds, or if you have a reasonable doubt thereof, you will acquit the defendant, Melvin Rainwater."

Appellant also presented to the court the following requested instruction, which was refused: "If you find from the evidence in this case that the said children of the defendant, Melvin Rainwater, while in custody of their mother, refused the only support, maintenance and help that the defendant, Melvin Rainwater, could possibly offer or give them, or if you have a reasonable doubt thereof, you will find the defendant, Melvin Rainwater, not guilty." It is appellant's position that the testimony of his second wife and of himself touching the offer of a 20-acre farm to his first wife during her life raised the issue covered in the requested instruction. It is observed that there is nothing to show that the use of such land could have contributed anything to the support of appellant's small children. The land is not described in the testimony. As far as the record reflects the matter, it might have been an incumbrance instead of an asset. Under the terms of the offer, if appellant made it, his first wife could not have sold the land and used the proceeds for the support of appellant's children, Again, appellant could not exonerate himself because Eloise Norvell made an offer to support the small children of his first wife. And particularly is this true as to the offer made during the year 1938 when Miss Norvell was not the wife of the appellant. It could not be expected that the first wife would accept such an offer, and, in our opinion, she was not required to in view of the testimony of the State to the effect that appellant left his wife because of his desire to be with Miss Norvell. Hence the offer, in so far as it was made in 1938, would not constitute a defense. It was appellant's duty, and not the duty of Miss Norvell, to furnish support to his children. If he did not support them, and was able to support them during the year 1938, he was guilty of the offense with which he was charged. In passing, it is observed

that Mrs. Rainwater denied that any such offer had been made. Be that as it may, it follows from what we have said that we are of the opinion that the offer of the appellant which his second wife claims she authorized in no manner exonerated appellant for his failure to support his minor children during the year 1938. We think the court's instruction on the appellant's affirmative defense to the effect that he contributed to the best of his ability and in proportion to his earning capacity was adequately covered in the charge of the court.

It might be added that appellant's second wife testified that the first offer was made during the year 1938. The proof on the part of the State was to the effect that appellant also wilfully failed and neglected to support his children during the year 1937 and part of the year 1936. The years last mentioned were within the period of limitation. Manifestly, appellant was not entitled to be acquitted because of an offer made in 1938 and 1939 if during the years 1936 and 1937 he wilfully neglected and failed to support his children.

The judgment in affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

KRUEGER, Judge.

In his motion for rehearing appellant earnestly contends that we erred in several respects in the original disposition of this case as reflected by the opinion delivered by this court on the 8th day of May, 1940.

He first asserts that he was entitled to an instruction by the court to the effect that if the children of the appellant, while in the custody of their mother, refused the only support and help which he could possibly give or offer them, etc. to acquit him. If the evidence had raised the issue, then there might be some merit in his contention, but the evidence fails to show that the children refused to accept any material assistance or support. His testimony to the effect that he offered her (the mother of the children) the use of a 20-acre tract of land would not, in our opinion, contribute to their support. They could not have sold it. They could not have lived thereon without food or wearing apparel. Even if they had undertaken to grow a garden or a crop, they still needed food which he failed to furnish until whatever they planted and undertook to grow had matured.

Moreover, the land mentioned did not belong to the appellant. It belonged to Eloise Norvell whom he married on the 30th day of April, 1939.

We have carefully reviewed the record and remain of the conclusion that the question here presented was properly disposed of on the original submission.

Appellant next contends that inasmuch as in the divorce proceeding the trial court awarded the children to the mother and ordered appellant to pay twenty-five dollars per month to the mother for their support that this order deprived the court of jurisdiction to try him for the offense herein charged. The order referred to was not an res adjudicata of fact that he failed and refused to support his minor children. The order merely directed him what to do in the future with reference to the children. Consequently there is no merit in the appellant's contention that the plea of former jeopardy should have been sustained.

Appellant also contends that the evidence relative to what occurred in the years 1935 and 1936 should not have been admitted because the same was beyond the period of limitation. There is no exception in the record to any of this testimony. Moreover, the court, in his charge to the jury, specifically instructed them that in determining the issue of whether or not he failed and refused to support his children, they could only take into consideration evidence of his neglect and refusal to provide for their support within the period of three years prior to the 11th day of July, 1939, and not what he failed or refused to do prior to the three-year period. Consequently there is no merit in the appellant's contention.

All other matters complained of have been fully and carefully considered by us and are deemed to be without merit.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON APPLICATION FOR LEAVE TO FILE SECOND MOTION. FOR REHEARING.

GRAVES, Judge.

A second motion for a rehearing has been presented herein, same being received on July 8, 1940, after the adjournment of the term of this court on the last Saturday in June. At that

term this cause was affirmed in an opinion handed down on May 8, 1940; thereafter, on June 26, 1940, appellant's motion for a rehearing therein was overruled in a written opinion of this court, and this court on the 29th day of June 1940 adjourned for the term by operation of law. This application to file a second motion for a rehearing was not received by the clerk of this court until nine days after the adjournment of the term of court at which the judgment of affirmance became final. In the case of Silver v. State, 9 S. W. (2d) 358, we held:

"From what has been said it is apparent that by no provision of the statute is the Court of Criminal Appeals authorized to entertain a motion for rehearing after the adjournment of the term. It has been the practice to do so, however, in instances in which the first decision of the court is announced at a time less than 15 days before adjournment. The practice rests upon very little, if any, legal basis, but as a practical matter has much to commend it. The practice, however, has never been extended to authorize the court to consider a so-called 'second motion for rehearing' after the adjournment of the term.

"In the present instance the power of this court to revise a judgment which became final during the term upon the overruling of the motion for rehearing ceased with the close of the term, and at this time the court possesses no power to change the final judgment entered during the previous term, and, having no power to change its judgment or grant the relief prayed for in the application before it, it would be futile to permit the filing of said application."

The application to file second motion for a rehearing is denied.